Filed 9/26/22  In re D.H. CA1/4
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re D.H. et al., Persons Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY, <br><br>    Plaintiff and Respondent, <br><br> v. <br><br> L.H., <br><br>    Defendant and Appellant. | A163483 <br><br> (Alameda County Super. Ct. Nos. OJ14023578-02, OJ14023579-02, OJ14023580-02) |

Approximately seven years after asserting dependency jurisdiction over D.H. (now 16 years old), D.H.2 (now 13 years old), and D.H.3 (now 10 years old) (collectively, the children), the juvenile court denied a petition under Welfare and Institutions Code[1] section 388 filed by L.H. (Mother) to terminate the children's guardianship and return them to her care. Mother contends the juvenile court abused its discretion in denying her modification petition without an evidentiary hearing. We disagree and therefore affirm.

---

[1]    All further undesignated statutory references are to the Welfare and Institutions Code.

## BACKGROUND

The history of the dependency proceedings through the jurisdiction and disposition hearing is set forth in our prior nonpublished opinion, *In re D.H.* (Oct. 17, 2017, A148169), in which we affirmed orders removing the children from Mother's care. We limit our discussion to the facts germane to the issues in this appeal.

### A.    Initial Dependency Proceedings

Dependency jurisdiction was established in December 2014, after Mother submitted to the allegations in an amended petition filed by the Alameda County Social Services Agency (the agency). Specifically, according to the sustained petition: Mother was suicidal and homicidal in September 2014, wanting to take her life and the lives of her children, and it was unclear whether she was taking her prescribed psychotropic medication; Mother had recently used profanity and sexually explicit language in front of the children; D.H. and D.H.2 were reportedly kidnapped and raped by a neighbor in March 2014, but the police could not substantiate the allegations; Mother became fixated on the kidnapping and did not want to leave the home or let the children leave it; Mother took D.H. out of public school and was homeschooling him, but he was on truancy probation for failure to participate consistently and Mother had an arrest warrant issued based on her lack of compliance; Mother had not followed through with the agency and refused to provide information regarding the family's medical, mental health, and educational needs; and Mother failed to follow through with medical appointments for D.H.2 in connection with a needed hernia operation. (See *In re D.H., supra,* A148169.)

Although the agency had detained the children in October 2014, after a contested detention hearing the juvenile court found no basis for detention.

2

The children were thus released back to Mother on the condition that she enter individual therapy, keep her current psychiatric appointment, and cooperate with a psychological evaluation. (See *In re D.H., supra,* A148169.)

However, despite receiving family maintenance services from December 2014 through March 2016, Mother failed meaningfully to engage in therapy, take her psychotropic medication consistently, or meet D.H.'s and D.H.2's educational needs. She also refused to provide mental health services for her children. (See *In re D.H., supra,* A148169.))

Following Mother's erratic behavior[2] at a March 2, 2016 review hearing, the juvenile court ordered the children detained and ordered the agency to file a supplemental petition pursuant to section 387. The agency's supplemental petition alleged that the previous disposition had been ineffective in the protection or rehabilitation of the children. In particular, the agency cited Mother's untreated mental health challenges and the risk of future neglect due to her failure to comply with her family maintenance plan, including her failure to ensure the children's attendance in a court-approved school setting. (See *In re D.H., supra,* A148169.)

In April 2016, at the combined jurisdictional and dispositional hearing on the supplemental petition, the social worker opined that the children were suffering from neglect with respect to their emotional stability and educational needs. According to the social worker, Mother was incapable of meeting their educational needs in the home environment and had too much

---

[2]     Mother started speaking irrationally, stating that she wanted the case closed so that she could move to Maine; that someone was breaking into her home when she is not there, most recently stealing pencils out of the children's backpacks; that her car was tampered with every day; and that she was concerned about what "they" do to her food so she throws it away. (See *In re D.H., supra,* A148169.)

fear to allow them to attend school regularly in the community. Similarly, Mother's fears left her unable to care for the children's emotional needs. D.H. reportedly stated that Mother yelled a lot, which was sometimes scary for him. At the conclusion of the hearing, the juvenile court found the allegations in the supplemental petition true, removed the children from Mother's custody, and found that reasonable efforts had been made to prevent or eliminate the need for removal. The court was particularly concerned with the children's emotional well-being and Mother's refusal to allow them to engage in necessary services. It found specifically that it was neglect not to allow treatment for the children after the allegations of sexual abuse. We affirmed the dispositional removal order. (See *In re D.H., supra,* A148169.)

## B.     *Reunification*

After the children were removed from Mother at the April 2016 dispositional hearing on the supplemental petition, they were placed with their maternal grandfather (Grandfather), with whom they have resided ever since.

At the six-month review hearing in November 2016, the juvenile court found that Mother had made minimal progress toward mitigating the causes necessitating placement and continued her reunification services.

In December 2016, the agency reported that Mother participated in a psychological evaluation with a court-appointed psychologist, who recommended ongoing individual therapy, consideration of psychotropic medication to help with mood stabilization and symptoms of anxiety and depression, continued visits with the children, and assistance in housing relocation and employment opportunities.

On December 13, 2016, the juvenile court authorized the agency to set up unsupervised, overnight visits between Mother and the children.

4

In January 2017, the agency reported that Mother continued to be fixated on the allegations of sexual abuse of her children during therapeutic visitation services and yelled, cursed, and used sexually graphic language in front of the children. However, the weekly overnight visitations with the children had gone well and Mother had not made aggressive statements about the sexual abuse in front of them.

In February 2017, during a visit, Mother began frantically to call 911 from D.H.'s cell phone after Grandfather was unable to pick her and the children up from her home. Mother began yelling out of her apartment to a police officer parked outside. The maternal aunt reported that Mother's mental health was unstable and that D.H. asked to go back to his placement.

In March 2017, the agency reported that Mother had made efforts to become engaged in family therapy services and had engaged in individual therapy. Mother had begun to work with the family therapist to demonstrate her ability to regulate emotions and prevent negative behaviors in a way that did not negatively impact her children. The children were hesitant to express their thoughts and opinions about their relationships with her, but reported that they enjoyed having regular contact.

At an unsupervised visit on March 11, 2017, Mother refused to return D.H.'s cell phone to him at the end of the visit and said she needed to use it for a few days. D.H. informed Grandfather, who was frustrated as he purchased the cell phone for D.H. Grandfather forcefully shoved the door to get into Mother's home and retrieved the phone and immediately left with D.H.; D.H. reported that Mother purposely threw a toy laser at his head and threatened to hurt him again if he told anyone about what went on during visitation. D.H. refused future visitation with Mother.

Following Mother's testimony at the contested 12-month review hearing on April 25, 2017, the juvenile court found that Mother had made substantial progress and continued her reunification services and unmonitored visitation.

## C.     *Permanency Planning: Legal Guardianship*

In advance of the 18-month review and permanency planning hearing on August 24, 2017, the agency submitted a status review report recommending that the juvenile court terminate Mother's reunification services and set the matter for a section 366.26 hearing with the plan of legal guardianship.

The report noted that in June 2017, Mother was arrested after she had a verbal altercation with Grandfather during a supervised visit. In July, Mother yelled, screamed and used sexually obscene language in front of the children during visitation. The children reported feeling scared when Mother could not regulate her emotions and said they enjoyed spending time with her when she was "happy." At a team decision meeting with Mother in August, Mother reported she did not have any visitation with her children, began cursing and yelling at Grandfather, and reported that the agency was trying to keep her children in foster care and make them orphans.

On September 13, 2017, the juvenile court terminated Mother's reunification services.

On February 23, 2018, the agency submitted a status review report before a scheduled review hearing. The report noted that Mother and the children continued to participate in therapeutic visitation on a weekly basis, and that the family therapist reported that Mother had made some improvements in her ability to regulate her emotions and effectively parent the children. But it added that both D.H.2 and D.H.3 often became

dysregulated[3] around Mother. The report indicated that it was often hard for Mother to soothe D.H.2 in family therapy sessions; D.H.2 had "been observed to seek soothing behaviors from Mother as he often meets her and offers a 'hug' or attempts to hold the Mother's hand during sessions." According to the report, D.H.2 did not experience similar dysregulation with Grandfather.

The report also described an incident of physical violence that allegedly took place between Mother and Grandfather on December 30, 2017, in which Mother "physically assaulted" Grandfather after he refused to transport her in his vehicle. Grandfather subsequently initiated a restraining order against Mother, who was then arrested on three separate occasions for failing to comply with it.

In advance of the March 13, 2018 section 366.26 hearing, the agency submitted a report recommending that the juvenile court adopt a permanent plan of legal guardianship with Grandfather serving as the children's legal guardian. The report described Grandfather as "a great source of support and stability for the children during this dependency, and the majority of the children's life." The report noted "evidence of a healthy attachment" between them and stated that "the children report that they feel [Grandfather] is attentive to their needs and continues to provide a safe and suitable home." The report likewise described the children as "acknowledg[ing] that the caregiver actively protects their emotional and physical safety . . . when they report feeling scared due to the mother's actions." The report noted that, when asked about their feelings regarding their placement, all three children responded that they liked living with their grandfather.

---

[3] The American Psychological Association defines dysregulation as "any excessive or otherwise poorly managed mechanism or response." (APA Dictionary of Psychology <https://dictionary.apa.org/dysregulation> [as of 9/26/2022].)

On March 8, 2018, Mother filed a section 388 petition on Judicial Council form JV-180 seeking to change the juvenile court's April 2016 removal order allowing them to be placed with their Grandfather, so that she could ask for the return of her children based on changed circumstances at the permanency planning hearing that day. She stated that she had complied with her case plan and "moved to a new apartment away from the environment where the children were abused by a neighbor." In an accompanying declaration, Mother stated that she had been attending individual therapy from April 2016 through February 2018, and was currently attending family therapy. Mother also wrote that she was "very concerned that the children [were] not being cared for" in their placement. The juvenile court summarily denied Mother's petition, finding that it did not state new evidence or a change of circumstances.

At the 366.26 hearing on March 8, 2018, the juvenile court adopted a permanent plan of legal guardianship with Grandfather. The court also denied Mother's section 388 request.

**D.      *Modification of Visitation and Dismissal of Dependency***

On April 19, 2018, the juvenile court granted the agency's request to place the court-ordered therapeutic visitation on hold as the children reported feeling scared and unwilling to visit after an incident the previous month in which Mother was arrested after coming to Grandfather's house, forcing her way in and demanding that the children leave. In a follow-up interview with the social worker, the children stated that they wanted to "take a break" from visiting with Mother because her behavior made them "scared." D.H.2 reported that he observed Mother attempt to hit Grandfather. D.H. reported that Mother broke their television and dresser during the incident. D.H. also said Mother's behavior made him feel "embarrassed and

8

scared." The court granted the agency authority to arrange for visits consistent with the children's well-being.

In an August 13, 2018 status review report, the agency recommended the court dismiss the children's dependency, as they had been under a legal guardianship with Grandfather since April 2018 and had lived with him since 2016. The report noted that, following the physical altercation in March 2018, Grandfather had limited the time that the children spent with Mother outside of weekly therapeutic sessions. The report concluded that the children "are bonded to their grandfather who has acted in the capacity [of] a parent since 2016." The report acknowledged that Grandfather planned to retire to Arizona in 2019 and would take the children with him. The report reiterated that the children "have reported that they do not feel safe around [Mother] alone."

On August 21, 2018, the juvenile court ordered that Grandfather's legal guardianship continue and dismissed the children's dependency.[4]

---

[4] We note that "[a]fter a guardian is appointed, the juvenile court may continue jurisdiction over the child as a dependent of the court. Alternatively, the court may terminate dependency jurisdiction. (§ 366.3, subd. (a); Cal. Rules of Court, rule 5.735.) If dependency jurisdiction is terminated, the court retains jurisdiction over the child as a ward of the court as authorized by section 366.4 (§ 366.3, subd. (a)), but it no longer holds ongoing review hearings. (*In re K.D.* (2004) 124 Cal.App.4th 1013, 1019.) In either situation, if a problem develops, the parent has access to the juvenile court. (Rules 5.740(c), 5.570 [use of section 388 petition mandated]; cf. *In re Twighla T.* (1992) 4 Cal.App.4th 799, 806 [although dependency jurisdiction had been dismissed, the parent had access to the juvenile court 'through the court's jurisdiction over the guardianship itself'].)" (*In re Kenneth S., Jr.* (2008) 169 Cal.App.4th 1353, 1358.)

***E.   Mother's Section 388 Petitions Filed in 2019:  January, June, and October***

In January 2019, Mother filed another section 388 petition, once again asking the juvenile court to return the children to her care and arguing that revisiting their 2016 placement with Grandfather was warranted by changed circumstances. Mother noted that she had maintained employment and housing and was participating in weekly therapy. The juvenile court summarily denied the petition based on Mother's failure to identify new evidence or a change of circumstances.

In June 2019, Mother renewed her attack on the April 2016 removal order in a third section 388 petition, again arguing that she had maintained housing, work, and a relationship with the children. The juvenile court likewise denied that petition, again finding that there was no new evidence or change of circumstances.

Mother filed a fourth section 388 petition in October 2019, asking the court to return the children to her care and terminate the legal guardianship. She argued that she had addressed the mental health issues underlying the dependency, was now stable, and was prepared to resume full-time care of the children. She noted that, in the year since the dependency was dismissed, the children continued to spend most weekends with her without incident. She also stated that she had completed a 26-month course of individual therapy and voluntarily underwent a mental health assessment in August of 2019 that found no major mental health disorder or mood disorder. She added that she was working full-time, which provided her with an increased and stable income, and that she had stable housing and had recently been approved for subsidized housing. She also stated the subsidized housing was located across the street from both an elementary school and a middle school, where she planned to enroll the children if they were returned to her care.

Mother noted that Grandfather had previously planned to retire and move to Arizona with the children in 2019 but had since delayed his plans by at least two years. She argued that the delay in Grandfather's plans constituted a change in circumstance because it allowed the children to maintain "frequent in-person contact with their guardian after returning to their mother's care." She additionally argued that the children "enjoy a strong relationship with their mother and have expressed the desire to live with her."

The juvenile court subsequently set a hearing on Mother's petition for December 19, 2019. In advance of the hearing, the agency submitted its response, recommending the court deny the petition and the children remain in the care of their maternal grandfather. The report noted that while Mother "loves her children very much" and the children "do want to maintain a relationship with her," she continued to suffer from untreated mental health issues that impacted her ability to provide an emotionally stable and safe environment for the children.

The agency based this recommendation on a series of face-to-face interviews with Mother and the children conducted in early December 2019. Mother told a social worker that she last attended individual therapy in December 2018 and that she stopped going when the dependency was dismissed, because she felt that she had "got out everything there was to talk about." Mother likewise stated that, while she had taken psychotropic medication briefly in the past, she was not currently taking it because she felt she was "healthy enough and didn't need it." She later said that, while she felt she "could use counseling," she did not need medication.

When the social worker asked Mother if she understood the circumstances that led to her children's removal, she said it was because she

11

was "calling the police saying that her son was gang raped" and she was a "frantic single mother." Mother stated that between 2014 and the present, she placed "about 1000 calls" to the police regarding the children's alleged abuse. The social worker asked about the last time Mother called the police about her son being "gang raped." Mother responded that she had last called during the summer of 2019. When the social worker asked whether Mother still asked her children about being "gang raped" or touched, Mother replied "sometimes." She said that she last spoke with D.H. about it this year, and that D.H. "flat out lies about it" and tells her that nothing happened. She last asked D.H.2 and D.H.3 about it in July 2019. She believed her children had been sexually abused since they had been removed from her custody.

The social worker then interviewed D.H., who stated that although he loved Mother, he wanted to remain in Grandfather's care. D.H. said that he felt that Mother had not addressed her mental health issues and was the "same" as at the beginning of the dependency. D.H. noted he "barely goes to visits" with Mother and only goes to "make sure everything is okay" with his brothers. D.H. reported that, at visits, he had seen Mother "yell and use cuss words and call his brothers bad names," "hit them with her hand or a belt," and threaten them. D.H. also stated that Mother continued to ask them about the alleged incident of sexual abuse. D.H. said that he would be concerned for his brothers' safety if they were to live with Mother.

D.H.2. told the social worker that while he liked going to visit Mother, he was "not sure if [he] want[ed] to live there." D.H.2 stated that he "gets in trouble" at Mother's house and that she would sometimes hit him with her hand or a belt. According to D.H.2, Mother continued to ask him about sexual abuse at "every visit." D.H.2 said that he was worried he would not be allowed to go back to Grandfather's house if he went to live with Mother and

12

"something bad happened," such as a fight between Mother and another individual.

D.H.3 likewise told the social worker that while he enjoyed visiting Mother, he was not sure that he would like to live with her. He said that he got in trouble at Mother's house and, when that happened, she would yell at him or hit him. D.H.3 reported that "at the last visit," she hit him on his arm and "on his head hard." D.H.3 said he wanted visits with Mother to "stay the same" and wanted her to get "help with her anger."

On December 19, 2019, the juvenile court denied Mother's section 388 petition and ordered the dependency to remain dismissed.

## F.  *Mother's Section 388 Petition Filed in July 2021*

On July 6, 2021, Mother filed the section 388 petition at issue in the instant appeal, in which she asked for the court to reopen dependency, terminate the guardianship, and return the children to her care. She argued that there was a change in circumstances in several respects. First, she contended that she had made efforts to ensure that the issues that gave rise to the dependency would not recur, noting that she had "resumed weekly therapy sessions" and completed a 10-week parenting skills class in preparation for regaining custody of her children. Second, she stated that she recently gave birth to a fourth son, whom she was parenting without court intervention, and with whom the children had formed a relationship during their overnight visits. Third, while she acknowledged that the court had been aware of Grandfather's proposed relocation to Arizona three years earlier when it dismissed the dependency with Grandfather as the boys' guardian, she noted that the now-imminent move was occurring two years later than originally projected, when the children were older, that it would end "the boys' easy movement and ongoing face-to-face contact with their mother," and

13

that Grandfather intended to establish a new family unit that includes his girlfriend and her 8-year-old child.

Mother argued that it was in the children's best interest to be returned to her custody because she had been addressing her mental health issues and had demonstrated a new ability to manage her interactions with Grandfather without confrontation as well as to care for a new baby. She also argued that Grandfather's impending move would "upend" a situation in which, through frequent overnight visits, the children had been able to maintain relationships with her as well as with Grandfather, and that she would ensure they could maintain contact with him through visits and telecommunication.

On July 13, 2021, the agency filed its own section 388 petition, this one asking the court to grant Grandfather permission to reside with the children in Arizona and to reissue letters of legal guardianship. The petition stated that Grandfather had recently retired and moved with the children to Arizona, and that "[t]he boys are in agreement with the move and do not wish to return to their mother's care."

The juvenile court held a remote hearing on July 15, 2021, to determine whether to hold an evidentiary hearing on the dueling section 388 petitions. The court heard from counsel for the agency, the children, Grandfather, and Mother. The agency's counsel argued that there was no information in the petition showing that moving the children to Mother's home would be in their best interest, or indicating that they would not continue to do well with Grandfather; she also argued that the fact that Mother was now in some therapy did not show changed circumstances. The children's counsel stated that her colleague was able to have lengthy conversations with each of the boys, that they told him they did not want to return to their mother's care,

14

and that each "had reason for some level of excitement" about the move to Arizona. Grandfather's counsel argued that Mother's petition made no "assertion that the children want to move" and asked that the court "consider their wishes also as represented by their counsel." Mother's counsel argued that the petition showed Mother was doing better overall, that she recently had a fourth son, and that moving would "split up this sibling group, which was not the case before."

In response, the court first acknowledged Mother's desire to have the children form a bond with her new baby, but explained that it could not consider them to be in a "sibling group" with the baby because they were not similarly situated and had been placed with Grandfather for five years. The court found it "unclear" what the change of circumstance was "other than the children will be moving out of state," the significance of which the court discounted because they would be remaining with the same caregiver they had been with for the past five years. With respect to Mother's mental health, the court observed that Mother's papers indicated only that she had attended a few visits of psychotherapy, and that the letter from the clinic stating that she had upcoming appointments failed to give the court "any information what's going on with the mother and/or her treatment." Regarding Mother's completion of a ten-week parenting class, the court stated: "I think mom completed that when this case was in reunification. We're not in a reunification space and place. This is a legal guardianship, a stable legal guardianship with family."

The court ultimately concluded that, while Grandfather's move to Arizona was "arguably" a change of circumstance, it was not a significant change because the children were in a stable placement, would continue to be in a stable placement they wanted to be in, and did not want to go back to

Mother's home. The court added, moreover, that "if we get to the best interest prong, assuming there's a legitimate change of circumstance, I don't know how anybody can make the argument that this is in the best interest of the child[ren] when they don't want to leave the home of the legal guardian, and they don't want to be placed with the mother." The court found that there was insufficient evidence in Mother's petition that, if put on at a hearing, could support returning the children to her home. It then stated that it would not grant an evidentiary hearing and was denying the petition.

At that point, Mother—who was also attending the hearing remotely—told the court that she had been doing therapy the entire time since the children were removed, and that no one had spoken to her children since the last petition in 2019. She stated that her children "do want to return home, and they do want to be with their little brother in the same home." She added that, while they had been with Grandfather for five years, they had been with her for ten years "without any incident, without any problems, and within a stable home," and "they've made it very clear that they want to return home." The court responded that the children have a guardian ad litem in their attorney, that it was the attorney's job to communicate with the children, and that the attorney did so and was told "very clearly that they don't at this point want to return home." The court reaffirmed that it would not grant a hearing on Mother's petition, and then stated it was granting the agency's petition, noting that the petition stated the boys agreed with the move and did not want to return to their mother's care. In its written orders denying Mother's petition, filed the following day, the court stated that there is "not a significant change in circumstance, and it is not in the best interest" of the children to grant the request, noting in each case that "[t]he child does not want to live with his mother."

On September 10, 2021, Mother timely appealed the denial of her July 2021 section 388 petition.

## DISCUSSION

Under section 388, a parent may petition "for a hearing to change, modify, or set aside any order of court previously made" on the grounds of a "change of circumstance or new evidence." To prevail on the petition, the parent must establish that the changed circumstances or new evidence are such that the proposed change in the court's order would promote the child's best interests. (§ 388, subds. (a)(1), (b); *In re Marilyn H.* (1993) 5 Cal.4th 295, 309–310.) The petition is liberally construed in favor of granting an evidentiary hearing, but the parent must still establish an entitlement to the hearing by making a prima facie showing of both elements—changed circumstances *and* best interests of the child. (*In re Samuel A.* (2020) 55 Cal.App.5th 1, 7.) The petition cannot consist of conclusory allegations, but must allege facts that, if supported by evidence credited at the hearing, would sustain a favorable decision. (*Ibid.*) "When determining whether the petition makes the necessary showing, 'the court may consider the entire factual and procedural history of the case.' " (*Ibid.*) In the absence of the necessary showing, the court may deny the petition summarily without an evidentiary hearing. (*Ibid.*; see Cal. Rules of Court, rule 5.570(d)(1).) Alternatively, if the court does not deny the petition ex parte, it may—as it did here—"order a hearing for the parties to argue whether an evidentiary hearing on the petition should be granted or denied." (Cal. Rules of Court, rule 5.570(f)(2).) We review a court's decision to deny the petition without an evidentiary hearing for abuse of discretion unless it is based on a mistake of law on undisputed facts. (*Samuel A., supra,* 55 Cal.App.5th at p. 7.) The parties agree that the abuse-of-discretion standard applies in this appeal.

When, as here, a section 388 petition is filed after family reunification services have been terminated, the juvenile court's overriding concern is the child's best interest. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) The parent's interests in the care, custody and companionship of the child are no longer paramount, and the focus shifts to the needs of the child for permanency and stability. (*Ibid.*; *In re Malick T.* (2022) 73 Cal.App.5th 1109, 1123.)

In this case, the juvenile court did not abuse its discretion in concluding that Mother failed to make a prima facie showing of changed circumstances such that returning the children to her custody would be in their best interests. On the first prong—that of changed circumstances—the court could reasonably conclude, considering the past history of the case, that the evidence did not demonstrate sufficient progress in addressing Mother's issues, given that she had only "begun psychotherapy" and had "attended a few sessions thus far." (See *In re Mickel O.* (2011) 197 Cal.App.4th 586, 615 ["the petitioner must show *changed,* not changing, circumstances"]; see also *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 [to support a section 388 petition the purported change of circumstances must be substantial; "[a]ppellant's completion of a drug program, at this late a date, though commendable, is not a substantial change of circumstances"].)[5] The court could also reasonably conclude that Grandfather's move to Arizona, including its potential impact on the children's relationship with Mother's new baby,

---

[5]     We note that the court's statement that Mother completed the parenting course "when this case was in reunification" was incorrect. The court terminated reunification services in September 2017, whereas Mother completed the online course in 2020. Nonetheless, we do not consider this mistake determinative in light of the court's more significant concern that the evidence regarding Mother's mental health treatment was equivocal.

was not a significant change in circumstance given that the court had been aware of Grandfather's planned move at the time it established the guardianship and the move was unlikely to impact the stability of their placement with him given the length of time they had already lived with him.

Even if we assume that the petition had made a prima facie showing of changed circumstances, however, we would still find no abuse of discretion in the juvenile court's conclusion that the allegations did not show that terminating the guardianship and returning the children to Mother's care would have been in their best interest. (See *In re K.L.* (2016) 248 Cal.App.4th 52, 62 [conclusory allegations, unsupported by declarations or other evidence, did not make a prima facie showing that modification would be in the children's best interests].) "[B]est interests is a complex idea" that requires consideration of a variety of factors. (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 530; see *In re Jacob P.* (2007) 157 Cal.App.4th 819, 832–833.) In looking at the factual and procedural history of the case, the court may take into account factors such as the seriousness of the reason leading to the child's removal, the reason the problem was not resolved, the passage of time since the child's removal, the relative strength of the bonds with the child, the nature of the change of circumstance, and the reason the change was not made sooner. (*In re Mickel O.*, *supra*, 197 Cal.App.4th at p. 616; *In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 446–447; *In re Justice P.* (2004) 123 Cal.App.4th 181, 188–189.)

By the time Mother filed her section 388 petition in July 2021, reunification services had been terminated for four years. At this point, the children's interests in permanency and stability were the court's foremost concern, outweighing Mother's interest in reunification. Mother argued that her requested order would be better for the children because "[if] they move

19

to Arizona with [Grandfather], they will lose on-going in-person connection to their Mother and the opportunity to bond with their half-brother." But again, the court could reasonably find this conclusory allegation insufficient in light of the fact that the children had lived with Grandfather for five years and he had been their legal guardian for three years. They were bonded to him and did not want to reside with Mother. Although their preference is not determinative, it is "powerful demonstrative evidence" that remaining with him would be in their best interest. (See *In re Aljamie D.* (2000) 84 Cal.App.4th 424, 432.)

Mother argues that it was unclear how recently the children's counsel had spoken to them about their wishes, pointing to her statement at the hearing that no one had spoken to them since the last petition was filed in 2019 and that "my children do want to return home, and they do want to be with their little brother in the same home." On this basis, she argues that the court was required to hold an evidentiary hearing to get the most current evidence regarding the children's wishes. The parties have not identified, and we have not found, any published authority addressing the proper role of such information provided at a hearing under California Rules of Court, rule 5.575(f)(2) to determine whether to order an evidentiary hearing. However, as Grandfather's counsel argued, Mother's petition did not identify any evidence, or even make any allegations, about the children's wishes. The juvenile court could reasonably conclude that Mother's assertions at the hearing, after Mother's counsel had already spoken and the court had announced its ruling, did not cure the petition's failure to make the requisite prima facie showing.

Accordingly, we cannot find any abuse of discretion in the juvenile court's decision to deny Mother's section 388 petition without an evidentiary hearing.

## DISPOSITION

We affirm the orders of the juvenile court.


GOLDMAN, J.


WE CONCUR:


STREETER, Acting P. J.
BROWN, J.